## Tuigg, Trustee, &c. *versus* Treacy.

104 | 493
116 | 452

1. Where a controversy in a court of law involves the consideration of the rules or laws of church government, such rules or laws must be proved as facts, and when so proved, the civil courts will, in general, enforce them as they would enforce any other voluntary agreement between parties.

2. In an action of assumpsit, brought by a priest of the Roman Catholic Church against the trustee of the St. B. church, to recover for monies advanced by him in the erection of a mission school or church within the parish of St. B., built under the direction of a former bishop of the diocese of P., which included said parish, the jury found a special verdict, setting forth, inter alia, that under the laws and customs of the Roman Catholic Church in said diocese, the bishop, as trustee, had full control of the receipts and expenditures of the St. B. congregation, but had no right to appropriate the property for other use than that of the congregation. It not appearing in the special verdict that the said mis-

[Tuigg *v.* Treacy.]

sion school or church was built for the use of the congregation of said St. B. church, nor that St. B. congregation, as such, was consulted about said expenditures, though the management thereof was known to individual members the same as other business matters were known:

*Held*, that under the facts, and the laws and customs of the Roman Catholic Church, as found and stated in the special verdict, there was no implied assumpsit on the part of St. B. congregation to reimburse the plaintiff for his said advances, and he was, therefore, not entitled to recover.

3. Where the jury find certain facts in a special verdict, subject to the opinion of the court on the law, the court cannot consider any other facts than those so found and stated in the special verdict.

November 2d 1883.　Before MERCUR, C. J., GORDON, PAXSON, STERRETT, GREEN and CLARK, JJ.　TRUNKEY, J., absent.

ERROR to the Court of Common Pleas No. 2 of *Allegheny county :* Of October and November Term 1883, No. 157.

Assumpsit, by Rev. James Treacy against Rt. Rev. John Tuigg, trustee of St. Bridget's Roman Catholic Church, Pittsburgh, with notice to Rev. Jerome Kearney, pastor or quasi pastor of the same, and John McFarren, M. J. Farrell, Hugh Dorris, John Brown, and others, members of said church.

The plaintiff filed the following affidavit of claim, viz : " That the plaintiff is a Catholic priest in good standing, now of Rochelle, Ogle county, Illinois ; that formerly, to wit, prior to November 15th 1877, he was a Catholic priest of the Pittsburgh Diocese, stationed at St. Bridget's Roman Catholic Church, Enoch street, Pittsburgh ; that he was pastor of said church from about 1854 until about November 15th 1877 ; that during the term of his said pastorship of said church he received and disbursed in the neighborhood of $65,000 ; that there is now due and owing to him, on account of monies expended by him over and above the amounts received from said defendants, the sum of $3,241.58, which sum includes the interest due up to date upon the amount due him, as shown by statements marked Exhibit " A " and Exhibit " B," and hereto annexed and made part hereof; that the same is wholly due and unpaid, and that, although requested, the said defendants have failed and neglected to pay the said balance or any part thereof.　All of which is true and correct, to the best of affiant's knowledge, recollection and belief.

The defendants filed an affidavit of defence, and pleaded non-assumpsit, &c.

On the trial, the jury found the following special verdict : " We find, that under the laws and customs of the Roman Catholic Church in the diocese of Pittsburgh, the bishop of the diocese is trustee of the congregation in its temporal affairs, and either directly himself or through the priest and pastor of

[Tuigg v. Treacy.]

his appointment, controls and directs the receipts, and application of the property, income and expenditures of the congregation, but that the bishop has no right to appropriate the property for other use than that of the congregation. That the plaintiff was the duly appointed pastor or priest of St. Bridget's congregation, having as a parish certain territorial limits for said congregation. That by direction of Bishop Dominec, then bishop of the diocese, Father Treacy undertook missionary work among the colored population of the parish, and that from money contributed by the bishop and others, and from various sources, a lot was bought, and a building was erected a short distance from the St. Bridget's Church, within the limits of the parish, for the use of said missionary enterprise. That debts were incurred therefor, that a school was opened and religious services were conducted for several years, all under the supervision of the priest, under direction of the bishop, and the enterprise was known as St. Joseph's Church. That from time to time, as needed, Father Treacy, by the consent and approval of Bishop Dominec, used the funds raised in various ways for St. Bridget's Church, in and for this work, and that of the various amounts so expended there remains as yet not repaid the sum of $8,000. That it does not appear that St. Bridget's congregation, as such, was consulted about these expenditures, nor was it consulted as to other matters clearly and directly for its benefit, although the management of it was known to individual members, in the same manner as other business matters were known. That said sum of $8,000 is included in the credits of plaintiff in his management of the temporal affairs of the congregation, and that, if this amount is excluded, then the plaintiff has not paid out so much as he has received on account of St. Bridget's congregation, and the judgment should be for the defendants.

If the court be of the opinion that the law is with the plaintiff, then judgment to be entered in favor of the plaintiff on the verdict. If the court be of the opinion that the law is with the defendant, then judgment to be entered accordingly, non obstante veredicto.

Subsequently, on a motion for judgment on the special verdict, the court (EWING, P. J.), filed the following opinion, and judgment for plaintiff:

The verdict, based on the uncontradicted testimony, is that the bishop is the active controlling trustee of the property, real and personal, of the congregations of his diocese, and that the priest in charge is his agent, bound to obey his instructions, and accountable to the bishop for his action in the premises. That is the law of the church, and we accept it as found. The verdict in this case was fully warranted by the testimony.

[Tuigg *v.* Treacy.]

There was and is no room for doubt of the christian zeal and good faith of the plaintiff, nor of the .then bishop or of the present bishop, who was necessarily made a defendant. Any equities arising between the diocese and the congregation must be settled by the authorities of the church; we have no control thereof in this case. Under the findings of fact we are of the opinion, that the plaintiff is legally entitled to recover the balance which the jury have found to be due him.

And now, July 5th 1883, after argument and upon consideration of the question of law reserved, the court being of the opinion that the law is with the plaintiff, it is ordered that, upon payment of the verdict fee, judgment be entered on the verdict in favor of the plaintiff, and the levy on any execution, that may issue thereon, to be confined and limited to property held by the defendant in trust for St. Bridget's Roman Catholic church or congregation.

The defendants thereupon took this writ of error, assigning for error that "the judgment is erroneous.".

*Breil & Fitzpatrick*, for the plaintiffs in error, contended: that the plaintiff below, as agent of the trustee, cannot recover from the cestui que trust, where the agent has received the trust fund and intermeddled with the trust; that the agent of the trustee is bound, as the principal would have been, and cannot recover where there has been a breach of the trust; that the agent of a trustee is personally responsible, where he commits the breach of the trust, or assists therein; that the agent in this case, having committed a breach of the trust, his recovery is precluded; that the agent in this case can not protect himself in the breach of the trust, by having acted on the direction of his principal, even though the principal was his ecclesiastical superior; that courts will interfere to protect the rights of property in church controversies, and that the agent of a trustee has no lien or claim against the trust funds or property, though the principal may have a lien for proper expenditures: Hardy *v.* Caley, 33 Beav. 365; Portlock *v.* Gardner, 1 Hare 606; Pannell *v.* Hurley, 2 Coll. 241; Att'y Gen. *v.* Corporation of Leicester, 7 Beav. 176; Lewin on Trusts, 561; Worrell *v.* Harford, 8 Ves. 48, note; Hall *v.* Laver, 1 Hare 577; Francis *v.* Francis, 5 De G. M. & G. 108; O'Hara *v.* Stack, 9 Nor. 477; Chase *v.* Cheeny, 58 Ill. 509; Tuigg *v.* Sheehan, 12 W. N. C. 537.

*R. B. Carnahan*, and *A. V. D. Watterson*, for the defendant in error, contended that Bishop Dominec had power to establish the missionary enterprise and direct the building of the school house in connection with St. Bridget's Church, and to

use and permit the defendant in error to use the funds of St.
Bridget's parish for that purpose; and that the defendant in
error, as the bishop's subordinate and agent, having followed
his bishop's instructions, as he was bound to do, was not sub-
jected to liability for such expenditures, and was entitled as a
creditor to recover from the parish funds, such sum as would
reimburse him for advances made by direction of the trustee,
his principal, for the benefit of the trust: Maw v. Pearson, 28
Beav. 196; Lewin on Trusts, 2d Amer. Ed. 226, and authorities
cited in notes t and u.

Mr. Justice CLARK delivered the opinion of the court,
January 7th 1884.

This being an action of assumpsit, the plaintiff below is
only entitled to judgment, upon proof of a contract, expressed
or implied. As no express agreement is shown, the only
question is whether the law will presume one from the conduct
of the parties.

The St. Bridget's Church is an unincorporated religious asso-
ciation, comprised of Roman Catholics residing in the city of
Pittsburgh, within certain parish limits, prescribed by the
bishop of the diocese, and, although others are either named as
defendants, or have notice of this proceeding, St. Bridget's
Church only is affected by the plaintiff's recovery, and is, there-
fore, the real party defendant. Rev. James Treacy, the plaintiff
below, a Roman Catholic priest, for many years prior to 1877,
was the duly appointed pastor of St. Bridget's, and as priest and
pastor, had such charge of the affairs of the congregation, both
temporal and spiritual, under the bishop of the diocese, as is
provided by the laws and customs of the Roman Catholic
Church. The Rt. Rev. John Tuigg, for the time being, is the
bishop of the diocese of Pittsburgh, which diocese embraces
the territorial limits of the St. Bridget's parish.

It appears from the special verdict of the jury " that under
the laws and customs of the Roman Catholic Church in the
diocese of Pittsburgh, the bishop of the diocese is trustee of
the congregation in its temporal affairs, and, either directly
himself or through the priest and pastor of his appointment,
controls and directs the receipts, and application of the property,
income and expenditures of the congregation, but that the bishop
has no right to appropriate the property for other use than that
of the congregation."

During the period of his pastorate, Father Treacy, whose
personal piety and religious zeal is admitted on all sides, under-
took to perform missionary work among the colored people,
within the limits of his parish. The movement was encouraged
and liberally supported by Rt. Rev. Michael Dominec, then

[Tuigg *v.* Treacy.]

bishop of the diocese, who was moved to the work by instructions from Rome. With means contributed by Bishop Dominec and others, " a lot of ground was purchased, and afterwards, a building was erected a short distance from St. Bridget's Church, within the limits of the parish for the use of the said missionary enterprise." Father Treacy here opened a school, and conducted appropriate religious services, from time to time, in the interest and for the exclusive benefit of the colored people, the whole work being under the immediate direction and control of the bishop. The building was known as the St. Joseph's Church. The congregation of St. Bridget's does not appear to have had any direct connection with St. Joseph's, beyond this, that the St. Joseph's Church structure was located within what was designated as its parish limits, and Father Treacy was the priest and pastor, or teacher, in both. In the erection of the St. Joseph's Church, and maintenance of the mission work there, Father Treacy, with the bishop's consent, used of the funds of the St. Bridget's Church to the amount of $8,000 and upwards, which sum has never been refunded to St. Bridget's. These expenditures were made without consultation with or consent from the congregation; they were embraced, however, in the account rendered by the pastor to the bishop at the close of his pastorate, of his management of the temporal affairs of that congregation. Father Treacy, however, now claims to have expended in this enterprise, of his own money a considerable sum, for which he has never been reimbursed, and this suit is brought to recover that sum, which has been liquidated by the jury at $3,354.98.\

By the special verdict, the jury has put the facts upon record substantially as here stated, submitting to the court the question of the defendant's liability under the law. In the determination of this case, we are necessarily confined to the specific facts thus presented; we cannot aid the verdict by any inference, implication or intendment of fact. We cannot resort to the testimony, or to such extrinsic matters as were undisputed at the trial, or avail ourselves of such even as appear upon the record. It is of the very essence of a special verdict, that the facts found are those upon which the court is to pronounce judgment, according to law. What is not thus found is presumed not to exist, the verdict being conclusively the complete result of the jury's deliberation upon the whole case presented.

In Pennsylvania the term " parish " has no especial legal signification, it is used merely in its general sense. In English ecclesiastical law, it has been used to designate the territory committed to the particular charge of a parson or priest. In the absence of a state church here, however, the status of a

[Tuigg *v.* Treacy.]

parish is rendered comparatively unimportant; if used in ecclesiastical divisions, it has just such importance and particular signification as may be given it under ecclesiastical regulations. The rules of a church organization constitute the law for its government, and the civil courts will, in general, recognize and enforce these as any other voluntary agreement, between the parties. But what may be the law of the church government, is a matter of fact in courts of law, and must appear in the proof. If there is anything in the laws, customs, policy or practice of the Roman Catholic Church, which commits the exclusive charge within certain territorial parish limits, to the priest of that parish, and which imposes the burden of all expenditures, the bishop or priest in their discretion may make, in the work of the church within those limits, upon the congregation organized therein, that fact should have appeared in the special verdict, as, under such circumstances the law would, perhaps, presume a promise to repay money paid, laid out and expended, especially where, as here, the objects and uses to which it was applied, were open and readily discoverable to all. The mere fact, however, that Father Treacy, as the pastor of St. Bridget's, "had as a parish certain territorial limits for his congregation," and "that the mission was among the colored population of the parish," without more, establishes no such relation between the parties as would by implication bind St. Bridget's for the expenditures made. If the enterprise had been originally undertaken, or, at any stage of advancement, had been assumed by St. Bridget's, or, if the work, under the peculiar polity and practice of the Roman Catholic Church, was imposed upon St. Bridget's, as a condition and law of its organization, then, perhaps, the law might imply a promise which would support an action of assumpsit, brought by one standing in the relation of priest and pastor to the congregation, and exercising control in its temporal affairs.

The title to the lot of ground, upon which St. Joseph's Church was erected, was not taken in the name of St. Bridget's, nor in the name of any other for the use of that congregation, nor does it appear, that St. Bridget's ever exercised, or claimed, or sought to exercise any care or control in the management of its affairs, spiritual or temporal. The contributions made by the bishop and others were not made to, or through, or in aid of St. Bridget's; the several congregations, for anything that appears, were in their temporal affairs totally distinct; indeed, it is expressly found that St. Bridget's was never at any time consulted on the subject.

It is urged, however, that these expenditures were made by the plaintiff, under the express direction of the bishop, who was the trustee of St. Bridget's, and had the power to appropriate

[Edmundson *v.* Wragg.]

the incomes of the church. But it appears that the bishop's power, under the laws and customs of the church, is subject to a well-defined limitation: the jury find, that the bishop "has no right to appropriate the property of the church, for other than the use of the congregation," and his power was subject to a like limitation under the law of the state, as declared by statute of April 26th 1855, Pur. Dig. 1262.

Whether or not, therefore, Father Treacy paid and expended the money of St. Bridget's, and his own, in the St. Joseph's mission, at the instance and request of the bishop, is not important, as the bishop had no more right to pledge the credit of the congregation, in an enterprise which it had not undertaken or assumed, and in which it had no particular concern, or to divert the funds of the congregation from their proper use, than the pastor himself, and neither, it would appear, had any such power.

Judgment reversed.